UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:23-cv-866-RJC
(3:20-cr-249-RJC-DCK-1)

| | |
|---|---|
| ANTHONY TOMMY FOSTER, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | ORDER |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |
| ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc. 1; see also Doc. 3 (Memorandum)].

I.     BACKGROUND

The Petitioner was indicted along with Alejandro Padilla and Reynaldo Padilla[1] for: conspiracy to traffic five or more kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count One); and possession with intent to distribute five or more kilograms of cocaine and aiding and abetting the same in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2 (Count Two). [3:20-cv-249 ("CR") Doc. 33]. A summary of the offense is as follows:

> … Colombiano, a broker in Mexico, contacted a confidential informant ("CI") in North Carolina, looking for a cocaine source in the United States for a customer in Chicago who wanted between 20 and 40 kilograms of cocaine and possibly more than 100 kilograms. Working under the direction of law enforcement, the CI agreed to supply the cocaine at $25,000 per kilogram but requested that the first transaction occur in North Carolina. A person later identified as Reynaldo Padilla called the CI from a Chicago telephone number to make arrangements. Colombiano told the CI that Padilla would purchase 20 kilograms of cocaine for $500,000 and that the CI should "front" Padilla another 4 kilograms. While the original plan had been for 40 kilograms, the amount was reduced for logistical reasons, with an eye toward a later sale of additional cocaine if all went

---
[1] The Padillas pleaded guilty, accordingly, the Petitioner was tried alone. [See CR Docs. 49, 59].

1

well.

> On June 29, 2020, Reynaldo Padilla and Alejandro Padilla ("the Padillas") arrived at a Hilton Garden Inn in Gastonia, North Carolina, to meet the CI and an undercover officer. The Padillas, who were from Chicago, were driving a dark Buick Encore with Illinois license plates. Reynaldo showed the CI and the undercover officer a photograph on his cell phone of packages of vacuum-sealed money and said that the man with the money was nearby, assuring the undercover officer that he trusted the man and had been doing business with him "for a while." … Reynaldo explained that there were six bundles of $70,000, and one bundle of $80,000—totaling $500,000. The Padillas then drove to retrieve the money.
>
> A short time later, the Padillas arrived at a nearby Hampton Inn where Foster—also from the Chicago area—was waiting. He carried a duffel bag of money directly to the back of the Encore, placed the duffel bag in the back of the Encore, and the Padillas drove away. Returning to the Hilton Garden Inn, the Padillas gave the duffel bag of money to the undercover officer in exchange for the cocaine. All three men were arrested shortly thereafter.
>
> Following their arrests, the Padillas and Foster were transported to the Gaston County Police Department for questioning. Afterwards, all three men were moved to a single interview room to await transfer to the Gaston County jail. There was an audio and video recording device in the room that recorded the men whispering to each other and talking behind their hands or with their shirts covering their mouths, and Foster writing notes on scraps of paper that he showed to his codefendants before putting them in his mouth and chewing them and later spitting into a wastepaper basket….

United States v. Foster, No. 21-4437, 2022 WL 4354340, at *1–2 (4th Cir. Sept. 20, 2022).

The parties stipulated that "[t]he video recordings from this investigation on June 29, 2020 from … the Gaston County Police Department are authentic copies of the original recordings and are admissible at trial." [CR Doc. 76; see CR Govt. Ex 43 (Video)]. However, counsel filed a Motion in Limine seeking to preclude the Government from publishing a law enforcement-created transcript of any conversations between Petitioner and the Padillas while they were at custody at the Gaston County Police Department, pursuant to Federal Rules of Evidence 403 and 1002. [CR Doc. 83; see Doc. 83-2 (Transcript)]. At the final pretrial conference, Petitioner's counsel argued that the authenticity of the transcript is in question, and requested an evidentiary hearing regarding

2

its accuracy and whether it is supported by a proper foundation. [CR Doc. 134 at 17]. The Court reviewed the transcript and the recording, and determined that the transcript was accurate. [CR Doc. 112 at 3]. The Court thus denied the Motion in Limine, subject to the establishment of an adequate foundation.

At trial, Agent Rios testified that, after the Petitioner and the Padillas were arrested, they were interviewed separately, then they were placed in an interview together while they waited to be transported to the Gaston County Jail. [CR Doc. 113 at 133]. It is standard for there to be recording devices in interview rooms. [Id.]. The jury was informed that "[t]he parties have stipulated that the video recordings from this investigation on June 29, 2020 from the Gaston County Police Department are authentic copies of the original recordings and are admissible at trial." [Id.]. Agent Rios identified the recording and testified that the exhibits that were played at the trial are accurate clips from that recording. [Id. at 134]. Agent Rios further testified that he created a transcript of what he was able to hear from the video after listening to it more than 10 times over the course of approximately 12 hours. [Id. at 134-35, 140]. He explained that "it's hard to hear what conversation they had. They're talking in low voices, covering their mouth with their hands and their shirt. But I just kept playing over and over listening – trying to listen to what they were trying to say." [Id. at 135]. The Court instructed the jury as follows before the video was played and it was provided with the transcript:

> … Government's Exhibit 43 is represented to be a transcript of the recording that's contained in Government's Exhibit 60 which has been admitted into evidence. The recording is in evidence. The transcript represents itself as a record of what was said. Specifically, it is intended as an aid to identify who is speaking and what was said. You are specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine. You should make this determination without prejudice or bias, based on the testimony regarding the preparation of the transcript, your own comparison of the transcript to what you have heard on the recording, and any other relevant evidence or testimony. **Should**

3

> **you determine that the transcript is incorrect or inaccurate in any respect you should disregard it to that extent. Remember, the evidence is the recording itself**.

[CR Doc. 113 at 135-36] (emphasis added). Counsel's renewed objection to the transcript was overruled. [Id. at 136]. On cross-examination, Agent Rios testified that he had never seen Petitioner in verbal conversation with either of the Padillas prior to the video, that Petitioner does not speak Spanish, and that Rios' transcription was not occurring contemporaneously with the conversation. [Id. at 138-40]. Agent Rios had previously spoken to the Petitioner and the Padillas before the recorded conversation occurred. [Id. at 141]. Agent Rios ascribed names to what the different individuals said while he produced the transcript, and he noted that certain utterances were unintelligible. [Id. at 147]. Agent Rios does not have any specialized training in sound technology. [Id. at 153]. His report, which he wrote before he produced the transcript, is less specific than the transcript. [Id. at 152-53]. It is common to make a more detailed analysis of certain evidence such as an audio recording once the case has been assigned for trial. [Id. at 154].

The Court again instructed the jury regarding the transcript at the close of the evidence that the transcript is only intended as an aid and that, if the jury determines that it is incorrect or inaccurate in any respect, the jury should "disregard it to that extent." [CR Doc. 114 at 14-15].

During its closing argument, the Government addressed the conversation that was recorded in the interview room as follows:

> … [T]here was a lot of questioning about, how can you be so sure about the identification of who was talking and what was said? I submit that Agent Rios did a perfect job. But even if you disagree, the point isn't necessarily the content of what they were saying. But isn't it the way – first of all, the fact that they were talking to each other, and the way they were talking to each other; forgetting about what exactly was being said, okay.
>
> Now, and again, how are they doing it? Were they having a regular conversation? Was anybody excited, like, 'Oh, my God. What's going on here?' Or were they having a regular conversation? No. They were whispers. They were

4

facing down to avoid. You even saw Mr. Foster was cognizant of the fact that there may have been cameras watching. Look down. Do things under the table. Cover your mouth with your hand, cover it with your shirt. These are all consciousness of guilt. He is trying to avoid being heard. Why does he have to avoid being heard? Because he's guilty.

The very first thing you can hear when … Mr. Foster comes in …. Who is the first person that you can audibly here right away? Mr. Foster looks at Alejandro Padilla, the driver, you know, he's kind of like the mule, if you will, right? He was driving Reynaldo Padilla? You could tell from the interactions among the Padillas who was kind of above whom, right? And he turns to Alejandro because he's maybe the weak link, right? Mr. Reynaldo Padilla even said 'I've got a background,' right? He's going to be in more trouble because he's got a background. You can make a conclusion as to what he was talking about.

So it was Alejandro. He may be the younger guy. He may not be experienced in this kind of stuff as much. So he was the one that Mr. Foster said, 'Don't say a thing.' Conspiracy for drugs, conspiracy for money, conspiracy for silence. Consciousness of guilt. This is a legal concept. And the behavior, both physical and verbal what was being said demonstrate consciousness of guilt.

And they're describing the details of what was going on and the plan, right? why would you do that if you didn't know what was going on, discussing it all? More, more, and more conversation, trying to see who's going to talk.

And, oh, it did show up, good. And Mr. Foster, they're going to kill. This is serious business. This is serious business. What's going to happen? Somebody lost $500,000 worth of cocaine….

And then, again, words are valuable here, but actions. What's going on in these clips I'm showing you right now, or these images? He tears a piece of paper even, and he is writing a note. He is the one who is telling the others what to do, what not to do. He tears the note. … Then, of course, he puts it in his mouth and chews it. And then one hour later…. What happens? He does it again. He's got another note. Shows it to Reynaldo Padilla, chews it up….

[Doc. 114 at 22-24]. Defense counsel argued that the jury should disregard the transcript and Agent Rios' testimony, and conclude that there is insufficient evidence establishing Petitioner's guilt. [Id. at 28-29].

The jury found Petitioner guilty of both counts as charged. [CR Doc. 97]. The Court sentenced Petitioner as a career offender to 25 years' imprisonment for each count, concurrent,

5

followed by 10 years of supervised release. [CR Doc. 129].

The Petitioner argued on direct appeal that the Court erred *inter alia* by admitting the recording because it violated the Fifth Amendment and Miranda,[2] and by allowing the jury to use a Government-prepared transcript of the recording because there was no sound basis for the identification of the speakers. The Fourth Circuit Court of Appeals affirmed on September 20, 2022. It found that the recorded statements in the interview room did not violate the Petitioner's Fifth Amendment rights because the voluntary and spontaneous statements "were not in response to police interrogation, but were freely given to his codefendants." Foster, 2022 WL 4354340 at *3. The Fourth Circuit further found that the Court did not abuse its discretion by allowing the transcript to be published to aid the jury because Petitioner's argument that Agent Rios' voice identification of the Padillas was unreliable was inconsistent with the evidence, and because the Court's cautionary instructions cured any prejudice that may have resulted from discrepancies between the video and the transcript. Id.

Petitioner filed the instant pro se Motion to Vacate on December 15, 2023.[3] [Doc. 1]. He argues that trial counsel was ineffective for (renumbered and restated): (1) failing to move to suppress and object to the recorded conversation pursuant to the Fourth and Fifth Amendments, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, and on hearsay grounds; (2) stipulating to the jury's use of a government-created transcript of the recorded conversation; and (3) failing to object to Agent Rios' improper opinion testimony regarding the recorded conversation pursuant to Rule 701. He claimed that he was "prejudiced as a result" of counsel's deficient performance. [Doc. 1 at 4-5, 7-8, 13]. He seeks an evidentiary hearing, the vacatur of his

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] Petitioner's wife signed the Motion to Vacate under penalty of perjury pursuant to Rule 2(b)(5) of the Rules Governing § 2255 proceedings.

conviction and sentence, and a new trial without the "illegally obtained evidence." [Id. at 14]. On January 25, 2024, counsel filed a Memorandum in support of the Motion to Vacate reiterating Petitioner's claims, and additionally arguing that: Petitioner was subjected to unreasonable pretrial detention under the Fourth Amendment; and a reasonable probability existed that the outcome of the trial would have been different had counsel sought suppression and exclusion of the recording and its fruits. [Doc. 3]. The United States filed a Response [Doc. 4] and the Petitioner filed a Reply [Doc. 5]. Having been fully briefed, these matters are ripe for consideration.

## II. STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the argument presented by the Petitioner can be resolved based on the record and governing case law and that no evidentiary hearing is warranted. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970). Accordingly, Petitioner's request for an evidentiary hearing is denied.

## III. DISCUSSION

1) **Statute of Limitations**

Motions to vacate filed pursuant to 28 U.S.C. § 2255 are subject to a one-year statute of

7

limitations, which runs from the latest of:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

An otherwise untimely claim relates back to the original timely-filed pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). For the Court to find that an otherwise untimely claim relates back to the original timely filed petition, the amended claim must arise from a "common core of operative facts," and may not be dependent on events that are separate both in time and in the substance of the facts upon which the original claims depended. Mayle v. Felix, 545 U.S. 644, 664 (2005) (discussing a habeas corpus petition pursuant to 28 U.S.C. § 2254).

The Petitioner's conviction became final for purposes of § 2255(f)(1) on December 19, 2022, when the time to file a petition for writ of certiorari expired. See Clay v. United States, 537 U.S. 522, 524-25 (2003). The Petitioner therefore had one year, until December 19, 2023, to seek § 2255 relief. The Petitioner timely filed a Motion to Vacate within that one-year period. [Doc. 1]. However, counsel's supporting Memorandum [Doc. 3] was filed more than a month late on January 25, 2024. [Doc. 3].

Petitioner argued in his original timely Motion to Vacate that counsel was ineffective for

failing to suppress the interview-room recording because he had a reasonable expectation of privacy under the Fourth Amendment. [Doc. 1 at 5]. Counsel's untimely Memorandum raises an entirely new Fourth Amendment theory – that the surreptitious recording subjected him to impermissible conditions of pretrial detention. Although the Petitioner's search and seizure claim is alleged to have occurred at the same time as the pretrial detention claim, the pretrial detention claim that is based on an entirely new legal theory that does not relate back to the original Motion to Vacate. See Gray v. Branker, 529 F.3d 220, 241 (4th Cir. 2008) (an entirely new conflict of interest claim did not relate back to original, timely conflict of interest claim).

The remaining arguments in the Memorandum that, for instance, elaborate on the Petitioner's prejudice arguments, are timely because they relate back to the original Motion to Vacate. See International Chem. Workers Union, Local No. 566 v. Mobay Chem. Corp., 755 F.2d 1107, 1110 (4th Cir. 1985) (untimely amendment related back because it "arose out of the same occurrence and simply amplified the prayer for 'other relief'").

Accordingly, Petitioner's pretrial detention claim is dismissed with prejudice as time-barred and, alternatively, it fails on the merits for the reasons discussed *infra*.

**2) Ineffective Assistance of Counsel**

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within

the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689).

To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. It is not sufficient to show the mere "'possibility of prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1994) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). A petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a reviewing court need not even consider the performance prong. Strickland, 466 U.S. at 670.

A "refined" version of the Strickland analysis applies when a petitioner claims ineffective assistance based on counsel's failure to file a suppression motion. United States v. Pressley, 990 F.3d 383, 388 (4th Cir. 2021) (quoting Grueninger v. Director, Va. Dep't of Corr., 813 F.3d 517, 524 (4th Cir. 2016)). The inquiry for the performance prong is whether the "unfiled motion would have had 'some substance.'" Id. at 524-25 (citing Tice v. Johnson, 647 F.3d 87, 104 (4th Cir. 2011)). If the motion would have had some substance, then the question is whether reasonable strategic reasons warranted not filing the motion. See id. at 529; Tice, 647 F.3d at 104-05. To satisfy the prejudice prong, the petitioner must show that: (1) "the [suppression] motion was meritorious and likely would have been granted, and (2) a reasonable probability that granting the motion would have affected the outcome of his trial." Grueninger, 813 F.3d at 525.

a) **Video**

    i) **Fifth Amendment**

It is well settled that a criminal defendant cannot "circumvent a proper ruling ... on direct appeal by re-raising the same challenge in a § 2255 motion." United States v. Dyess, 730 F.3d 354, 360 (4th Cir. 2013) (quoting United States v. Linder, 552 F.3d 391, 396 (4th Cir. 2009)); see also United States v. Roane, 378 F.3d 382, 396 n. 7 (4th Cir. 2004) (noting that, absent "any change in the law," defendants "cannot relitigate" previously decided issues in a § 2255 motion); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir.1976) (holding criminal defendant cannot "recast, under the guise of collateral attack, questions fully considered by this court [on direct appeal]").

The Fourth Circuit determined on direct appeal that the recorded conversation did not violate the Petitioner's Fifth Amendment privilege against self-incrimination because Petitioner's statements were freely made to his co-defendants and, thus, were not the functional equivalent of a police interrogation. See Foster, 2022 WL 4354340, at *3 (quoting United States v. Swift, 623 F.3d 618, 623 (8th Cir. 2010)); see also United States v. Arce, 49 F.4th 382, 389 (4th Cir. 2022) (noting that law enforcement is required to read Miranda warnings only in "interrogations that are custodial"). Petitioner may not now take a second bite at the apple by presenting the same claim under the guise of ineffective assistance of counsel.

Petitioner's argument that the recording violated the Padillas' Fifth Amendment rights fails because "[t]he Fifth Amendment privilege is purely personal…." In re Grand Jury Subpoena John Doe No. 05GJ1318, 584 F.3d 175, 184 (4th Cir. 2009) (citing United States v. White, 322 U.S. 694, 698 (1944)). He, therefore, lacks standing to raise a Fifth Amendment claim on behalf of the Padillas, and counsel cannot be deemed deficient for failing to raise it.

**ii) Fourth Amendment**

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const.

amend. IV. A government agent's search is unreasonable when it infringes on "an expectation of privacy that society is prepared to consider reasonable." United States v. Jacobsen, 466 U.S. 109, 113 (1984). "In order to demonstrate a legitimate expectation of privacy, [an individual] must have a subjective expectation of privacy," United States v. Bynum, 604 F.3d 161, 164 (4th Cir. 2010), and that subjective expectation of privacy must be "objectively reasonable; in other words, it must be an expectation that society is willing to recognize as reasonable," United States v. Bullard, 645 F.3d 237, 242 (4th Cir. 2011) (internal quotation marks omitted). The expectations of privacy of an individual taken into police custody "necessarily [are] of a diminished scope." Maryland v. King, 569 U.S. 435, 462 (2013) (quoting Bell v. Wolfish, 441 U.S. 520, 557 (1979) (pretrial detainees "retain some Fourth Amendment rights upon commitment to a corrections facility"). This is because "a jail shares none of the attributes of privacy of a home…." Lanza v. State of N.Y., 370 U.S. 139, 143-45 (1962) (noting that, "[i]n prison, official surveillance has traditionally been the order of the day."). The burden of showing a legitimate expectation of privacy rests with the defendant. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980).

Here, Petitioner has failed to explain how his conversation with the Padillas in a police interview room in which recording equipment is standard, following their arrest, raised an objectively reasonable expectation of privacy. See Lanza, 370 U.S. at 143. Further, Petitioner's conduct during that conversation indicates that he was subjectively aware that it was not private, e.g., by speaking at a low volume, covering his mouth with his hands and shirt, and referring to "cameras." [See CR Doc. 42]. He has failed to demonstrate that he had a reasonable expectation of privacy regarding his recorded statements. See, e.g., United States v. Duncan, 598 F.2d 839, 850 n.7 (4th Cir.1979) (citations omitted) (observing no expectation of privacy in a police interrogation room); United States v. Jones, 648 F. App'x 383 (4th Cir. 2016) (arrestee had no

12

Case 3:20-cr-00249-RJC-DCK   Document 149   Filed 04/10/24   Page 12 of 19

objectively reasonable expectation of privacy in a police vehicle where radio and electronic equipment was visible); United States v. Swift, 623 F.3d 618, 622 (8th Cir. 2010) (no reasonable expectation of privacy in a conversation with a co-defendant where the suspect "recognized the likelihood that officers were watching him"); United States v. Delibro, 347 F. App'x 474, 475 (11th Cir. 2009) (no reasonable expectation of privacy when the suspect "was well aware that law enforcement could be monitoring his conversations" with his mother).

The Petitioner's argument about the pretrial conditions of his detention under the Fourth Amendment is likewise unavailing. [See Doc. 3 at 35]. Petitioner cites Manuel v. City of Joliet, 580 U.S. 357 (2017) and Albright v. Oliver, 510 U.S. 266 (1994) which hold generally that pretrial deprivations of liberty are covered by the Fourth Amendment, and pretrial detention can violate the Fourth Amendment when it precedes, and when it follows, the start of a the legal process in a criminal case. Although arrestees and pretrial detainees enjoy some protection from the Fourth Amendment, the Petitioner has failed to demonstrate that the recording at issue violated any of his Fourth Amendment rights. See generally Dyess, 730 F.3d at 359 (vague and conclusory allegations in a § 2255 petition may be disposed of without further investigation by the district court); see, e.g., Bell, 441 U.S. at 557 (shakedown searches and visual body-cavity searches of pretrial detainees following contact visits do not violate the Fourth or Fifth Amendments). Petitioner's Fourth Amendment challenges are meritless and, therefore, counsel cannot be deemed deficient for failing to raise them.

### iii) Title III

Title III generally prohibits the unauthorized interception of "any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). An "oral communication" is defined as "any oral communication uttered by a person exhibiting an expectation that such communication is not

subject to interception under circumstances justifying such expectation…" 18 U.S.C. § 2510(2). "The legislative history of [this statutory provision] shows that Congress intended this definition to parallel the 'reasonable expectation of privacy test' articulated by the Supreme Court in Katz." United States v. Beauchamp, No. 3:17-cr-134, 2018 WL 3614009, at *5 (W.D.N.C. July 27, 2018) (quoting United States v. Turner, 209 F.3d 1198, 1200 (10th Cir. 2000)) (citation omitted). Title III also excludes from the definition of "interception" any recordings made by "any telephone or telegraph instrument, equipment or facility, or any component thereof ... being used by ... an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii).

Petitioner had no reasonable expectation of privacy in his police station conversation as discussed in Section ii, *supra*.

Further, Agent Rios testified that recording equipment is standard for police interview rooms. Accordingly, it also falls within Title III's law enforcement exception. See generally United States v. Hammond, 286 F.3d 189, 192 (4th Cir. 2002) (phone calls that were recorded by the federal Bureau of Prisons pursuant to its ordinary course of duties fell within Title III's law enforcement exception); Deegan v. Rudman, No. 3:10-cv-16, 2011 WL 251226 (W.D. Va. Jan. 26, 2011) (recording from a police department interrogation room fell under Title III's law enforcement exception because it was routine procedure, as a safety and security measure, to record the occupants of the interrogation rooms at the Charlottesville Police Department). Counsel cannot be deemed deficient for failing to raise a meritless Title III objection that would have been rejected.

### iv) Hearsay

Hearsay is a statement that is offered in evidence to prove the truth of the matter asserted

in the statement. Fed. R. Ev. 801(c)(2). A "statement" is an "oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Ev. 801(a). Under Rule 801(d)(2)(E), a co-conspirator's statement is admissible if it was made "during the course of and in furtherance of the conspiracy." In order to admit a statement under 801(d)(2)(E), the moving party must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy. United States v. Graham, 711 F.3d 445, 453 (4th Cir. 2013). A statement by a co-conspirator is made "in furtherance" of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect. Id. (quoting United States v. Shores, 33 F.3d 438, 443 (4th Cir. 1994)). A defendant's membership in a conspiracy "is presumed to continue until he withdraws from the conspiracy by affirmative action." United States v. West, 877 F.2d 281, 289 (4th Cir. 1989). A "[w]ithdrawal must be shown by evidence that the defendant acted to defeat or disavow the purposes of the conspiracy." Id. A statement is "in furtherance" of the conspiracy "if it [is] intended to promote the conspiracy's objectives, whether or not it actually has that effect." United States v. Smith, 441 F.3d 254, 262 (4th Cir. 2006) (quotation omitted); see Graham, 711 F.3d at 453.

      The Petitioner contends that Rule 801(d)(2)(E) does not apply because the arrest of Petitioner and the Padillas ended the conspiracy. See Krulewitch v. United States, 336 U.S. 440, 442 (1949) (co-conspirator's statement made after the conspiracy's objectives had been achieved was inadmissible); Grunewald v. United States, 353 U.S. 391 (1957) (a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment). This argument is unavailing because the fact that some co-conspirators have

been arrested does not necessarily establish that the conspiracy was terminated. United States v. Bush, 944 F.3d 189, 196 (4th Cir. 2019); see United States v. Grubb, 527 F.2d 1107, 1109 (4th Cir. 1975) ("Arrest of some co-conspirators does not, as a matter of law, terminate a conspiracy"); United States v. Urrego-Linares, 879 F.2d 1234, 1240 (4th Cir. 1989) (the arrest of defendant and a single co-conspirator "did not necessarily mean that the conspiracy was terminated"). The evidence reflects that the conspiracy included a Mexican cocaine broker who remained at large after the Petitioner and the Padillas were arrested, and that the statements in this case were made shortly after Petitioner and the Padillas were arrested. [See CR Doc. 113 at 71-72]; United States v. Mathis, 932 F.3d 242, 254-55 (4th Cir. 2019) ("statements made between co-conspirators to inform each other as to the progress or status of the conspiracy are statements made in furtherance of the conspiracy," including statements to "induce a coconspirator's assistance to destroy evidence for the purpose of evading detention and arrest"); United States v. Ciresi, 697 F.3d 19, 29-30 (1st Cir. 2012) ("Statements made between coconspirators which provide reassurance or serve to maintain trust and cohesiveness among them further the ends of the conspiracy") (quotations and alterations omitted).

Moreover, the recording was not offered for its truth, but for the fact that the statements and actions that it captured were made. [See CR Doc. 134 at 19-20 (defense counsel stating "… I understand it is not being offered for the truth of the matter asserted….")]; see Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 173 n.18 (1988) (a statement is not hearsay if it is offered merely to show that the statement was made, and not that its contents are true); see also United States v. Brock, 667 F.2d 1311, 1315 n.2 (9th Cir. 1982) (coconspirator's attempt to evade DEA surveillance was nonassertive conduct, and was not hearsay). Reasonable counsel could have decided not to seek suppression under these circumstances.

### b. Transcript of the Recorded Statements

The Fourth Circuit found on direct appeal that "the district court did not abuse its discretion by allowing publication of the transcript as an aid to the jury," and that any prejudice that might have resulted from discrepancies between the video and the transcript were cured by the Court's repeated cautionary instructions. Foster, 2022 WL 4354340, at *3.

Petitioner's present argument that counsel should have objected to the transcript as improper opinion evidence under Rule 701 is foreclosed by the Fourth Circuit's findings that the Court did not abuse its discretion by allowing the transcript's use, and that any discrepancy was cured by the cautionary instructions. Moreover, Rule 701 addresses the admissibility of evidence as discussed in Section c, *infra*, whereas the transcript was not admitted as evidence. It was merely published to aid the jury. See United States v. Sampler, 368 F. App'x 362, 367 (4th Cir. 2010) (illustrative devices may be used "so long as they help jurors to understand the evidence presented and the court ensures that jurors do not consider the devices, themselves, as evidence"). Reasonable counsel could have determined that a Rule 701 objection to the transcript would have been frivolous. Accordingly, counsel was not deficient for failing to object pursuant to Rule 701, and any such objection would have been overruled.

### c. Agent Rios' Testimony

Under Rule 701, lay opinion testimony is admissible if (1) it is "rationally based on the witness's perception," (2) is "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and (3) it is "not based on scientific, technical, or other specialized knowledge within the scope of [Fed. R. Evid.] 702." Fed. R. Evid. 701. Lay opinion testimony under Rule 701 must be based "on personal knowledge." United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010) (internal quotation marks omitted).

Rule 701 does not apply here because Agent Rios did not interpret, or otherwise provide opinion evidence regarding, the recording. He listened to the recording and typed a transcript of the audible portions for the jury's convenience as discussed in Section b, *supra*. It was not admitted as evidence. Accordingly, this claim is dismissed and denied.

### d. Prejudice

The Petitioner's claims of ineffective assistance of counsel lack merit and accordingly, reasonable counsel would not have raised them, and the Court would have rejected them if counsel had raised them as discussed *infra*. Moreover, the evidence at trial was overwhelming. The evidence at trial was overwhelming. The jury heard testimony that law enforcement set up a controlled drug sale with an individual whom the Padillas had done business with for "a while" and, at the planned exchange, Petitioner placed a heavy bag containing nearly a half-million dollars of vacuum-sealed currency in the back of the Padillas' vehicle in a hotel parking lot. [See CR Doc. 113 at 33-42, 82; CR Gov. Ex. 13, 14 (video clips from Hampton Inn)]. There is no reasonable probability that, absent these alleged errors, the trial's outcome would have been different. See Strickland, 466 U.S. at 695; Eaton v. Angelone, 139 F.3d 990, 994 (4th Cir. 1998) ("[I]n the face of the [prosecution's] overwhelming evidence, we can ascribe no prejudice to any alleged errors by counsel...."). Accordingly, Petitioner has failed to establish prejudice and his claims of ineffective assistance of counsel are denied.

## IV. CONCLUSION

For the foregoing reasons, the Petitioner's § 2255 Motion to Vacate is dismissed and denied.

**IT IS, THEREFORE, ORDERED** that:

1. The Petitioner's § 2255 Motion to Vacate [Doc. 1] is **DISMISSED** and **DENIED**.

2. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

3. The Clerk is respectfully instructed to close this case.

Signed: April 9, 2024

_____
Robert J. Conrad, Jr.
United States District Judge